**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MCFADDEN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 13, 2015**

# In the Court of Appeals of Georgia

A15A0345. WONG et al. v. CHAPPELL et al.

McFADDEN, Judge.

Ruth Oleana Wong died after undergoing a cryoablation of the endometrium, a procedure to destroy a thin layer of the lining of her uterus through freezing. After her death, her husband, Kwee Wong, filed this medical malpractice action. He appeals the defense verdict in favor of doctors Mary L. Chappell, Kimberly A. Huffman, and Terry V. Kelley, and their practice, OB-Gyn Associates, P.A.

Wong argues that the trial court erred by refusing to charge the jury on simple negligence. Because at least some of Wong's allegations call into question only the execution of administrative, clerical tasks, not the exercise of professional skill and judgment, we agree and therefore reverse and remand. Since we are remanding, we address Wong's arguments that are likely to recur on retrial. Wong argues that the

trial court erred by refusing to instruct the jury on the unauthorized practice of medicine and negligence per se. We agree because Wong presented some evidence that an unlicensed medical assistant engaged in acts that required a medical license. However, we reject Wong's argument that the trial court erred by refusing to instruct the jury that the printed material from the manufacturer of the cryoablation device – the "package insert" and user's manual – established the standard of care for the use of the device. Although the printed material is relevant, expert testimony is required to establish the standard of care. We reject Wong's argument that the trial court erred by admitting a resource guide published after Mrs. Wong's procedure because he has not shown that the trial court abused her discretion. We do not address Wong's argument that the trial court erred in directing a verdict on his punitive damages claim because the resolution of that claim on retrial will depend on the evidence introduced. Nor do we address his argument that the trial court erred in allowing defense counsel to strike a juror for cause after the parties had begun exercising their peremptory challenges because any such error is unlikely to recur on retrial.

1. *Facts.*

Mary Chappell, an obstetrician-gynecologist, performed a cryoablation on Ruth Oleana Wong on October 4, 2010. Chappell performed the procedure in her office.

2

A few days after the procedure, Mrs. Wong began experiencing increased pain, which radiated along her flank to her back. On October 13, Mrs. Wong called Chappell's office. She spoke to Lauren Gephart, an unlicensed medical assistant. She told Gephart that she was experiencing pain radiating from her flank and back, bleeding, and changes in her bowel movement. Gephart thought that Mrs. Wong might have a urinary tract infection, so Gephart asked her whether she had any of the typical symptoms. Gephart did not talk to any doctor, nurse practitioner, or physician's assistant about the back and flank pain or the bleeding because she did not think Mrs. Wong's complaints were sufficiently serious, although she may have made a comment to Chappell in passing about Mrs. Wong's question about her bowel movement. Gephart told Mrs. Wong that her symptoms could be normal and advised her to take 800 milligrams of Ibuprofen; Gephart had been instructed by the doctors that she should advise patients to take 800 milligrams of Ibuprofen every eight hours as needed for any sort of abdominal or back pain. Gephart was not authorized to make medical diagnoses or to give medical advice, she testified, but one of the doctors in the practice, defendant Kelley, testified that the medical assistants were authorized to give medical advice that has been "supervised, taught, trained," by the physicians in the office. Huffman, another doctor-defendant, testified that Gephart should have

3

asked Mrs. Wong the intensity, duration, and severity of her pain, and should have notified Chappell if the pain was severe. Huffman testified that medical assistants "are allowed to give clinically relevant information as instructed by their supervising physician."

On October 17, Mrs. Wong went to the emergency room and was admitted to the intensive care unit. In the early morning of October 18, Huffman, who was the on-call doctor for OB-GYN Associates, saw Mrs. Wong. Later that day, Mrs. Wong underwent exploratory laparoscopic surgery. Although another physician performed the laparoscopy, defendants Chappell and Kelley were in the operating room; Chappell had asked Kelley to be available to assist should Mrs. Wong need a hysterectomy. Mrs. Wong's uterus was "very boggy," with a "dark, mottled" appearance. Chappell and Kelley believed that the cryoablation could have caused Mrs. Wong's uterus to look that way. Chappell decided not to remove Mrs. Wong's uterus, and Kelley concurred in the decision because he thought that Mrs. Wong would not survive a hysterectomy.

Eleven days after she was admitted to the hospital, Mrs. Wong died. More than two months after the cryoablation procedure – and after Mrs. Wong had died – Mrs.

4

Wong's written antibiotic prescription was found at the OB-GYN Associates office. Chappell had written on the slip, "Found December 8, 2010, at front desk."

Wong filed this action individually and as executor of Mrs. Wong's estate. He alleged that Chappell perforated the wall of Mrs. Wong's uterus during the cryoablation, eventually leading to sepsis and necrosis; that when Mrs. Wong called OB-GYN Associates about the resulting pain, Lauren Gephart failed to handle the call appropriately; that when she consulted at the hospital, Huffman failed to give Mrs. Wong care; and that Chappell and Kelley observed Mrs. Wong's necrotic, ischemic uterus during the exploratory laparoscopic surgery, but failed to perform a hysterectomy. Wong sought damages for Chappell's, Huffman's, and Kelley's professional negligence and for OB-GYN Associate's vicarious liability for Gephart's and the front desk staff's negligence.

After a 16-day trial, the jury returned a defense verdict. Wong filed this appeal.

2. *Refusal to charge the jury on ordinary negligence and instead charging that professional negligence applied to all claims.*

Wong argues that the trial court erred by denying his request to charge the jury on ordinary negligence and instead instructing the jury that the medical malpractice standard of care applied to all of Wong's claims. We agree.

5

Among his other allegations, Wong alleged that the defendants were vicariously liable for the following acts of negligence:

the front desk staff's failure to ensure that Mrs. Wong took her antibiotic prescription with her after the procedure, failure to notice that the prescription was left at the front desk for more than two months, and failure to notify Mrs. Wong or Chappell that Mrs. Wong did not get the antibiotic;

the staff's failure to implement proper procedures for handling prescription slips and failure to maintain the front desk in an organized manner so that the slip would not be lost;

medical assistant Lauren Gephart's failure to properly note Mrs. Wong's complaint of flank pain, failure to determine the severity, intensity and duration of her pain and continued bleeding, and failure to relay to a physician Mrs. Wong's complaints;

the failure to properly train Gephart regarding her phone triage duties.

In support of his allegations regarding the prescription slip, Wong presented evidence that Mrs. Wong's written antibiotic prescription was found more than two months after the procedure – and after Mrs. Wong had died– and that Chappell had written on the slip, "Found December 8, 2010, at front desk." In support of his allegations regarding Gephart's handling of Mrs. Wong's telephone call, he presented

6

the following evidence: Gephart's testimony that although Mrs. Wong complained of flank pain, which can originate in the pelvis, Gephart did not note flank pain on Mrs. Wong's chart because Gephart did not normally use that word and she categorized such pain as "all in the same area." Gephart did not recall asking Mrs. Wong how long she had had the pain, whether the pain was sharp or dull, constant or intermittent, its severity on a scale from one to ten, or whether her abdomen was soft and distended. Mrs. Wong reported bleeding, but Gephart did not write down the details. Gephart did not report Mrs. Wong's telephone call to any doctor, nurse, or physician's assistant. Gephart was not really concerned about Mrs. Wong's telephone call. Gephart had been trained by two other medical assistants.

"Claims of allegedly negligent administrative acts which do not require professional knowledge or skill assert ordinary negligence." *Peterson v. Columbus Med. Center Foundation*, 243 Ga. App. 749, 754 (2) (533 SE2d 749) (2000). In spite of Wong's allegations and the evidence he presented in support of them, the trial court refused to give the requested ordinary-negligence charge, reasoning that expert testimony was required to prove causation. But that is not the standard. This is the standard: only where the allegations of negligence against the professional involve the exercise of professional skill and judgment within the professional's area of

expertise does the claim sound in professional negligence. *Stafford-Fox v. Jenkins*, 282 Ga. App. 667, 671 (2) (639 SE2d 610) (2006). Contrary to the trial court's rationale, simply because expert evidence is required to prove causation does not mean that a case involves professional malpractice. See *Cowart v. Widener*, 287 Ga. 622, 627 (2) (a) (697 SE2d 779) (2010) ("[e]ven in simple negligence cases, plaintiffs must come forward with expert evidence . . . where 'medical questions' relating to causation are involved"); Ronald L. Carlson, Julian A. Cook III, and Michael Scott Carlson, Trial Handbook for Ga. Lawyers § 24:21 (3d ed.) ("While expert evidence is usually not required to prove causation in a simple negligence case, expert evidence may be required where a medical question involving specialized medical knowledge is needed in establishing causation, a causal link between a defendant's conduct and a plaintiff's injury.")

The trial court erred by concluding that because expert testimony was required to prove causation, all of Wong's allegations asserted claims of professional negligence. The allegations of negligence by the front desk staff, although asserted against professionals – the obstetrician-gynecologist defendants – do not involve the exercise of professional skill and judgment within the area of expertise of an obstetrician-gynecologist. Similarly, Wong's allegations that Gephart did not

8

document Mrs. Wong's complaint accurately and did not relay her complaint to a doctor do not involve the exercise of professional skill and judgment within the area of expertise of an obstetrician-gynecologist. Finally, Wong's allegation that the defendants failed to adequately train Gephart, an unlicensed medical assistant, to handle patient calls, does not involve the exercise of professional skill and judgment within their area of expertise. The permissible scope of a medical assistant's duties is set out in OCGA § 43-34-44, which allows medical assistants to perform certain medical tasks, and the corresponding administrative rule, Ga. Comp. R. & Regs. r. 360-3-.05. The permissible activities set out in those provisions are fully comprehensible by a layperson. Therefore any training that medical assistants are authorized to receive must likewise be fully comprehensible by a layperson and such training does not involve the exercise of professional skill and judgment. Accordingly, these are claims of ordinary negligence. *General Hosp. of Humana v. Bentley*, 184 Ga. App. 489, 491 (361 SE2d 718) (1987).

We observe that in addition to the allegations about Gephart's failure to document Mrs. Wong's complaint accurately and failure to relay the call to Chappell, Wong alleges that some of Gephart's actions amounted to the unlicensed practice of medicine. As discussed in Division 3, infra, this is a question for the jury. Should the

9

jury determine that some of Gephart's actions amounted to the unlicensed practice of medicine, then those actions would be held to the standard of care and skill of a medical professional. *Andrews v. Lofton*, 80 Ga. App. 723, 729 (2) (57 SE2d 338) (1950).

Because some of Wong's claims alleged ordinary negligence, the trial court erred by refusing to give Wong's requested jury charge on ordinary negligence. See *Taylor v. State*, 272 Ga. 744, 745 (1) (534 SE2d 67) (2000) ("It is error to refuse to give a charge . . . where the request is a correct statement of law that is pertinent and material to an issue in the case and not substantially covered by the charge actually given.") (citation and punctuation omitted). And the court exacerbated that error by instructing the jury that the professional negligence standard applied to all of Wong's claims. "When an error in the charge of the court is shown to exist, it is presumed to be prejudicial and harmful, and this court will so hold unless it appears from the entire record that the error is harmless." *Graham v. Fallick*, 322 Ga. App. 525, 528-529 (745 SE2d 747) (2013) (citation and punctuation omitted). It does not appear from the record that these errors were harmless. Accordingly we reverse the judgment entered on the jury's defense verdict and remand this case for proceedings not inconsistent with this opinion.

10

3. *Failure to charge the jury on the illegal practice of medicine and negligence per se.*

Wong argues that the trial court erred by failing to instruct the jury on the unauthorized practice of medicine and negligence per se, as he requested. We agree.

In essence, Wong contends that Lauren Gephart, the unlicensed medical assistant, was not authorized to assess the severity of Mrs. Wong's symptoms and to instruct her to take Ibprofen, that doing so violated OCGA § 43-34-22, the statute prohibiting the practice of medicine without a license, and that violation of this statute amounted to negligence per se. The defendants counter that Gephart's interactions with Mrs. Wong were permitted under OCGA § 43-34-44, which allows medical assistants to perform certain medical tasks, and the corresponding administrative rule, Ga. Comp. R. & Regs. r. 360-3-.05.

The statute, part of the Medical Practice Act of the State of Georgia, provides in pertinent part, "Nothing in this article shall be construed to prohibit the performance by medical assistants of medical tasks, including subcutaneous and intramuscular injections; obtaining vital signs; administering nebulizer treatments; or other tasks approved by the board pursuant to rule, if under the supervision by a

physician in his or her office. . . ." OCGA § 43-34-44. The rule provides in pertinent part:

> It shall be grounds for disciplinary action by the Board if a physician aids or abets another person in misrepresenting his/her credentials or engaging in unlicensed practice. Engaging in unlicensed practice includes delegation by a physician of professional responsibilities to a person who is not authorized to provide such services. A physician may delegate the performance of certain medical tasks to an unlicensed person with appropriate supervision as provided herein.
>
> (a) Medical Assistants: 1. For purposes of this rule, a medical assistant is an unlicensed person employed by the physician to whom he or she delegates certain medical tasks. (i) A physician may delegate to a medical assistant the following medical tasks: subcutaneous and intramuscular injections; obtaining vital signs; administering nebulizer treatments; or removing sutures and changing dressings. . . . (iv) Nothing in this rule prohibits the performance of tasks by medical assistants that would not otherwise require a license.

Ga. Comp. R. & Regs. r. 360-3-.05 (1).

Reading the statute and rule together, it is clear that medical assistants may perform certain specified medical tasks as well as tasks that do not require a medical license. The question, then, is whether Gephart's interaction with Mrs. Wong involved a task that required a license. With some exceptions not pertinent here,

12

OCGA § 43-34-22 (a) requires any person who "suggest[s], recommend[s], or prescribe[s] any form of treatment for the palliation, relief, or cure of any physical or mental ailment of any person" to have a medical license. Wong's expert testified that only a physician can handle complaints of post-operative pain, that medical assistants should not give treatment advice, and that Gephart should not have told Mrs. Wong that her symptoms were normal or instructed her to take Ibuprofen

. In their appellate brief, the defendants even state that "Gephart's alleged negligent acts required her to exercise independent medical judgment to decide . . . what to advise Ms. Wong to do." Whether it was appropriate for Gephart to perform these medical tasks is a question for the jury. Cf. *Cardio TVP Surgical Assocs. v. Gillis*, 272 Ga. 404, 406 (1) (528 SE2d 785) (2000) (because physician assistants, unlike medical assistants, are so heavily regulated by the Composite State Board of Medical Examiners, only the Board can determine whether it is appropriate for a physician assistant to perform a specific procedure). And if the jury should find that Gephart performed tasks that required a license, she would have engaged in the unlicensed practice of medicine. Such a finding would support Wong's requested charges. *Brown v. Belinfante*, 252 Ga. App. 856, 861 (1) (557 SE2d 399) (2001).

13

4. *Package inserts and user manuals do not, alone, establish the standard of care.*

Wong argues that the "package inserts," the documentation included with the freezing tool used to perform the cryoablation, established the standard of care and the trial court should have so instructed the jury. Similarly, he argues that Chappell's failure to follow the user manual included in this documentation amounted to simple negligence.

We hold that the package inserts are relevant to but do not conclusively establish the standard of care. "A person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill. Any injury resulting from a want of such care and skill shall be a tort for which a recovery may be had." OCGA § 51-1-27. "Such standard of care is that which, under similar conditions and like circumstances, is ordinarily employed by the medical profession generally. . . . Excepting in a few extreme circumstances, the question of compliance with the required standards must be presented through expert testimony." *Kenney v. Piedmont Hospital*, 136 Ga. App. 660, 664 (3) (222 SE2d 162) (1975). "[T]he appropriate medical standard is the province of the medical expert," *Morrison v. Koornick*, 201

14

Ga. App. 367, 370 (2) (411 SE2d 105) (1991), although documentary evidence can be relevant to the issue. See *Byrd v. Medical Center of Central Georgia*, 258 Ga. App. 286, 287-290 (1) (574 SE2d 326) (2002) (service manual used by hospital's surgical department was relevant to establish medical malpractice standard of care).

To allow the package inserts alone to establish a physician's standard of care would be inconsistent with OCGA § 51-1-27 and our case law because it would permit the manufacturer, rather than the medical profession, to establish the standard of care. See *Luckie v. Piggly-Wiggly Southern*, 173 Ga. App. 177, 178 (1) (325 SE2d 844) (1984) (violation of privately-established rule does not, alone, show negligence). Additionally, without expert assistance, a jury may not easily understand user manuals, which are written for the medical profession, not the general public. Nor has Wong presented any evidence that the manufacturer intended to establish the standard of care when it prepared the materials. Moreover, the materials cannot be cross-examined. For these reasons, we conclude that although relevant, the package inserts alone do not establish the standard of care.

Wong also argues that the failure to follow the package inserts was simple negligence that did not require expert testimony. We disagree. As detailed in Division 2, supra, "[w]hether an action alleges professional malpractice or simple negligence

15

depends on whether the professional's alleged negligence required the exercise of professional judgment and skill." *Peterson*, supra, 243 Ga. App. at 754 (2) (citation omitted). In any particular case, adhering to the manufacturer's recommendations and warnings may or may not have been within the standard of care when the alleged negligent act occurred. Wong's allegations of negligence in Chappell's use of the cryoablation tool challenge her professional judgment and skill and thus assert professional negligence.

The cases Wong cites for the proposition that failure to follow the written directions is simple negligence are distinguishable. In *Peterson*, supra, at 755 (2), the defendant had successfully moved to dismiss the plaintiff's complaint for failure to file an OCGA § 9-11-9.1 affidavit. We reversed as to one count of the complaint because at that preliminary stage of the proceedings, we took the plaintiff's allegations as true, and it was at least arguable that she had asserted a claim of simple negligence for which a § 9-11-9.1 affidavit was not needed. In *Sood v. Smeigh*, 259 Ga. App. 490 (578 SE2d 158) (2003), which is physical precedent only, we held that the defendant's act of assembling a prosthetic patella required only compliance with the manufacturer's instructions, not the exercise of professional discretion, so the plaintiff's action sounded in simple negligence. In *Lamb v. Candler General Hosp.*,

16

262 Ga. 70, 71 (1) (413 SE2d 720) (1992), our Supreme Court held that "the failure to replace disposable parts in the instrument involved in [that] case, as required for its safe performance, create[d] an issue of simple negligence by hospital employees" because, unlike here, professional skill and judgment were not involved. In *Dent v. Memorial Hosp.*, 270 Ga. 316 (509 SE2d 908) (1998), our Supreme Court held that the plaintiffs' allegations concerning nursing staff's failure to activate the alarm on a sleep apnea monitor – as the physician had instructed – asserted simple negligence because such acts did not involve the exercise of professional judgment.

5. *Admission of May 2011 resource guide.*

Wong argues that the trial court erred by admitting a "resource guide" that was not in effect at the time of Mrs. Wong's procedure. He argues that the admission of this document, which approved ten-minute freezes versus the earlier recommended, four-to-six minute freezes, allowed the defendants to argue that a ten-minute freeze was the standard of care.

We agree with Wong that the applicable standard of care is the standard of care at the time of the alleged negligent act. *McDaniel v. Hendrix*, 260 Ga. 857, 859 (1) (401 SE2d 260) (1991) (relevant standard of care is the standard of care employed by medical profession under similar conditions and like circumstances). But the trial

17

court could have found that the later-published resource guide was relevant to the standard of care at the time of Mrs. Wong's procedure, because it demonstrated the manufacturer's revision of its guidelines to reflect the practice in the medical community or information available at that earlier time.

"'[R]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401."[T[he admission of evidence is within the sound discretion of the trial court and appellate courts will not interfere absent abuse of that discretion. . . . [N]o matter how slight the probative value, our law favors admission of relevant evidence." *City of Atlanta v. Bennett*, 322 Ga. App. 726, 727-728 (1) (2013) (citations and punctuation omitted). See also OCGA § 24-4-402 (generally, "[a]ll relevant evidence shall be admissible. . . ."). Wong has not shown that the trial court abused her discretion in admitting this evidence.

6. *Remaining enumerations of error*.

Given our reversal of the defense verdict, we do not address Wong's argument that the trial court erred in granting the defendants' motion for a directed verdict on his punitive damages claim. Whether the trial court again grants that motion will

depend on the evidence presented at the retrial. Nor do we address Wong's argument that the trial court erred in allowing defense counsel to strike a juror for cause after the parties had begun exercising their peremptory challenges, because any such error is unlikely to recur.

*Judgment reversed and case remanded. Ellington, P. J., concurs;  Dillard, J., concurs in the judgment only.*